Read *v.* Davis.

4-9271                    234 S. W. 2d 371

Opinion delivered December 4, 1950.

*Rex W. Perkins* and *G. T. Sullins,* for appellant.

*Greenhaw & Greenhaw,* for appellee.

Griffin Smith, Chief Justice.  Mrs. Mary Inez Read died in November, 1948.  Her husband, Dan W. Read, and their only son and daughter—Carmen and James W. Read—are parties to this suit.  Carmen and James inherited through their mother certain business property in Fayetteville, subject to their father's curtesy and the payment of debts.

Dickson street is north and Locust street is east of the land here involved. Lots 1 and 2 are a part of Block 5, original town of Fayetteville. They front on Dickson street and had a platted depth of 122 feet. For practical purposes the northeast corner of Lot 1 is the southwest intersection of Dickson and Locust streets.

In September, 1947, H. O. Davis and his wife alleged in their complaint against Dan W. and Inez Read that they owned realty having a 40-ft. frontage on Dickson street and extending south 122-ft. The Davis lot begins 63-ft. west of the northeast corner of Lot 1 and extends west 40-ft. An allegation is that in 1933 Dan W. Read and his wife conveyed to R. C. Ambrose and his wife "the east part of the property now owned by these plaintiffs," including a 10-ft. easement or private alley extending 63-ft. east from the present Davis property to Locust street. At that time Read and his wife owned all of the land of which it is now claimed the easement was a part. Subsequent conveyances of the Ambrose lot placed the title in Fulbright Investment Company, and that corporation conveyed to the Davises. In all descriptions the grant included "with all appurtenances thereunto belonging."

In their complaint of 1947 the Davises described a brick building constructed by the Reads on the north end of the 40-ft. strip, but asserted their own property lacked 14 inches of extending to the Read line; but [said the Davises], in disregard of their ownership of this area the Reads began building a frame structure near the south end of the 40-ft. lot, extending across the controverted 14 inches and virtually touching the Davis wall. The prayer was that a restraining order issue (1) to prevent the Reads from trespassing on the 14-inch strip, and (2) to keep them from interfering with the plaintiffs in opening the 10-ft. easement leading to Locust street.

In 1929 Dan W. Read conveyed a part of Lots 1 and 2 to his wife, but the description on the east and west side was stated as 112-ft., leaving in the grantor, *prima facie*, a 10-ft. strip extending across Lot 1 65-ft. westward from Locust street.

Answer and cross-complaint were filed by Attorney O. E. Williams on behalf of the three Reads. This was followed by the Davis answer and an amendment to the original complaint, dated June 1, 1949. Mrs. Inez Read died in November, 1948. In the amendment it was asserted that after the original suit was brought D. W. Read desired an out-of-court settlement. Davis and Read were members of the First Baptist Church of Fayetteville; and, at Read's request, three members of the church were agreed upon as arbitrators.

The three churchmen conferred with Dan W. Read and H. O. Davis, and then personally inspected the properties. They recommended that the easement be opened at Davis' expense; that Davis permit Read to attach his building to the east wall of the Davis Business College (the brick structure heretofore referred to), subject to written specifications, but in other respects Read would set his wall back thirty inches to afford each proprietor better window facilities.

Dan W. and Carmen Read refused to abide the result of arbitration. Williams, as their attorney, filed an answer to the cross-complaint. He asked that former pleadings be treated as amended and that the three— Dan W., James W., and Carmen Read—be substituted as defendants. Chancellor Lee Seamster, who by appointment succeeded Chancellor John K. Butt, disqualified because he had been associated with Greenhaw & Greenhaw in representing the Davises. This disqualification was evidenced by an exchange of circuits through agreement between Chancellor Seamster and Judge Maupin Cummings of the Fourth Judicial Circuit.

Numerous pleadings were filed, but we think the essentials, and conduct of resident parties, justified Chancellor Butt in calling the cause for trial August 16, 1949. The only named defendant not present in person was James W. Read, who lived in Oklahoma. It is not made certain that information that the property would be sold reached James before the court order was made, although H. O. Davis testified that Dan W. Read told him, when the settlement was being discussed, that he

had talked with James the night before, and James told him that whatever he (the father) did would be satisfactory.

Due to the fact that the amendment through which the Davises claim under the arbitration award had been erroneously filed by the Chancery Clerk (June 1, 1949) with papers in a cause styled *Davis* v. *Head,* Mr. Williams had not seen the pleading and was surprised when told in open court that the controversy had been referred to the judgments of disinterested persons. Williams asked for an opportunity to confer with his clients—whom he had represented for twenty years or more,—so the matter went over until afternoon. During the intermission H. O. Davis and his son, Frank, conferred with Read and his daughter, and following these talks Chancellor Butt announced in open court that the parties were in accord. The docket notation was, "Settled by agreement, as per precedent."

It is stated in the Davis brief that after announcement of the settlement Judge Butt congratulated the parties upon the course they had taken. Judge Seamster, however, believing there should be a written memorandum, prepared the following and it was approved: "August 16, 1949. Agreed that H. O. Davis will pay Reads $16,250 for the land between Davis property and Locust street facing Dickson street back to Mrs. Smith's property: Warranty deed and abstract showing marketable title. (Signed) H. O. DAVIS, DAN W. READ, CARMEN READ." Before a decree embodying the compromise could be signed, Chancellor Butt was killed (Aug. 27) in an automobile accident.

A month after the settlement a suggested decree was presented to Judge Cummings for entry *nunc pro tunc.* This occurred before the August term had expired. Because Williams had proceeded throughout in the utmost good faith, the inference is clear that he was unwilling to act for the Reads in their endeavor to recede from the agreement. In these circumstances the law firm of Sullins & Perkins, in an entirely appropriate manner, came

into the transaction with an oral motion that a hearing on the petition be postponed until James W. Read could give his testimony in open court. On November 14, 1949, at a term succeeding the August proceedings, a written motion was filed "to vacate the proposed decree."

In a letter Williams wrote to James W. Read, August 20th, he said the suit resulting in the agreement involved a claim by Davis to 14 inches extending from Davis' east wall and a 10-ft. right-of-way on the south end of the land. Williams confirmed the factual background resulting in appointment of the arbitrators, saying: "Your father, in an unguarded moment—in the goodness of his heart and without consulting me—made a proposal for the church to appoint three members [to settle the dispute] and agreed to be bound by their decision; [so] when we went to trial Tuesday, Davis abandoned his claim under the original suit and insisted on the arbitration agreement being carried out. We saw that our chance to successfully defend the suit on this theory was very slim and your father thought it preferable to sell the property to Davis rather than be forced to carry out the award. They had been negotiating for a sale for the purpose of settling the matter and your father had been asking $18,000, and Davis had offered $15,000, so they finally reached an agreement at $16,250. Your father said he was sure it would be agreeable with you and told Davis that he had talked with you on the telephone the night before.

"The agreement was signed by all parties present, the abstract was turned over to the abstractor to be brought down to date so the title could be examined. I understand that Davis sent your father a check for $1,000, and the balance will be paid when the deed is delivered; therefore we will be very much embarrassed if you do not execute the deed. All of the above was done in open court in settlement of this lawsuit."

Williams then said that he did not think the price "was much out of line, if any."

In another letter to James (August 25th) Williams said: "A formal judgment or decree has not been en-

tered of record, but has been made by the court and is binding on all [who participated"].

After the trial had ended and while the Court was hearing argument, attorneys for Davis and his wife were permitted to introduce certified copies of several deeds, one showing purchase of Lot 2 by Dan W. Read in 1933 under forfeiture for taxes of 1929. In explaining another deed one of the attorneys for Davis said that a part of Lot 2 adjoining the Davis property was conveyed to Dan W. Read, who owned it when his wife died.

We think the Chancellor on Exchange properly held that Dan W. and Carmen Read were bound by the court's action of August 16, 1949, but that James was not. James admitted that he talked with his father by tele- phone, but denied they discussed the sale. It is quite clear that Williams, without fault or carelessness, thought he was serving James in asking that the heirs of Mary Inez Read should be designated as parties to the litigation; and, while it is hard to rationalize that a father and son would converse by telephone and that the father would withhold from his son information so vital to the negotiations emphasized by the background here, the Chancellor on Exchange who heard and saw the witnesses testify did not believe that a preponderance of the evidence disclosed actual authority upon James' part, or that there was conduct from which reasonable minds would agree that the father's right to sell was implicit in the relationships that had existed, or that there had been ratification.

The Davises contend that because a decree becomes effective from the day it is rendered, and because the term during which the August order was made had ended when the modification as to James occurred, the Court was without power to act except to make the record speak the truth. *Hollabaugh* v. *Taylor,* 134 Ark. 415, 204 S. W. 628; *McConnell* v. *Bourland,* 175 Ark. 253, 299 S. W. 44; *Ingram* v. *Wood,* 172 Ark. 226, 288 S. W. 393; *Wright* v. *Ford,* 216 Ark. 55, 224 S. W. 2d 50. But if, as James contends, he did not authorize the sale or ratify it, and he was without knowledge regarding the sale, it would be

void as to his interest, even though those who were present are bound.

The Court found that the cash value of Dan W. Read's life interest was $1,818.37 and that Carmen's half interest, subject to the life estate, was $7,215.81. The Davises were directed to pay these sums into the registry. Net rents due the Reads were found to be $614.88. These computations, as such, are not complained of.

We do not agree with Davis and those in interest with him that the property Dan and Carmen Read were to sell should be affected by the south ten feet not conveyed by Dan W. Read to his wife, by the easement to which reference has been made, or by the purchase of Lot 2 by Dan W. Read from the State. When the controversy was before the Court August 16th the differences concerned a 14-inch strip and the easement. It was assumed by all that property east of the Davis holdings would pass under the sale. This erased from consideration the 14-inch strip. Effect of the decree preserving James' interest is to create a co-tenancy. This gives either tenant the right of reasonable use, including the easement.

It is vigorously urged by the Reads that Davis and his wife did not intend to acquire the property in co-tenancy with James. The point is stressed that if H. O. Davis had known the consequences of his offer of $16,250 he would not have made it. This may be true, but the fact that he is willing to take about half of what he wanted would not justify the court in taking from him all that the *bona fide* sellers could convey. It follows that the decree should be affirmed on each appeal; but, because title to realty is involved, and because rentals have continued to accrue, the cause is remanded to permit adjustments of incidental disputes without giving such actions a separate Chancery Court number.

Affirmed.